## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOUGLAS A. BURD,** | : | **Civil No.  3:24-CV-00197** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LELAND DUDEK,**[1] | : | **(Magistrate Judge Carlson)** |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

### I.    <u>Introduction</u>

The plaintiff in this social security appeal, Douglas Burd, is a military veteran and previously worked in IT at a computer help desk. In November 2021, following two emotional outbursts at his job, Burd took a leave of absence and subsequently filed applications for disability and supplemental security benefits. He alleges he is unable to work due an array of psychological impairments including intermittent explosive disorder (IED), posttraumatic stress disorder (PTSD), attention deficit

---

[1]Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for the previously named defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

disorder (ADD), anxiety, bipolar disorder, borderline personality disorder, and depression. Despite his statements regarding the limiting effects of these impairments on his ability to work, the clinical record of his treatment is limited, showing only that he was receiving medication management and supportive therapy every three weeks. He also appeared to be relatively independent in his activities of daily living and two state agency medical consultants opined that Burd had only mild to moderate limitations in each area of mental functioning. Upon this limited and unremarkable record, on January 23, 2023, an administrative law judge (ALJ) concluded that Burd had not met the rigorous standards to demonstrate he was precluded from performing work-related activities under the Social Security Act and denied his claim.

This appeal followed. On appeal, Burd challenges the ALJ's decision, arguing that the ALJ's residual functional capacity assessment lacks evidentiary support, that the ALJ failed to properly evaluate the opinions of Burd's treating psychiatric providers, and that the ALJ erred in the symptom evaluation in this case. In considering these arguments advanced by the plaintiff, we recognize a legal truth: the Supreme Court has underscored for us the limited scope of our substantive review when examining Social Security appeals, noting that:

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

In this case, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we recommend that the Court affirm the decision of the Commissioner denying this claim.

## II.    Statement of Facts and of the Case

On November 4, 2021, the plaintiff, Douglas Burd, protectively filed an application for disability and disability insurance benefits under Title II and an application for supplemental security income under Title XVI of the Social Security Act, alleging an onset of his disability on November 12, 2021, due to a series of mental impairments including attention deficit disorder (ADD), anxiety, bipolar disorder, borderline personality disorder, depression, intermittent explosive disorder (IED), posttraumatic stress disorder (PTSD), sleep apnea, involuntary movements, and memory loss. (Tr. 14, 56). His claim was considered by an administrative law judge (ALJ) and, following a hearing, the ALJ concluded in a January 23, 2023, decision that Burd's conditions were not completely disabling under the rigorous standards which govern disability claims. (Tr. 11-29).

### A. The Medical Record and Burd's Activities of Daily Living

The record demonstrates that Burd suffered from several nonsevere physical impairments, including obesity, obstructive sleep apnea, and tremors, but his severe impairments were psychological in nature. On this score, the primary reason Burd cites for his inability to engage in sustained work-related activity is his difficulty interacting with others related to his bipolar and intermittent explosive disorder. In fact, the alleged date of onset of his disability in November 2021 coincides with a

second reported "outburst" at his job, where he was reported for yelling in the parking lot of his workplace after his car was repossessed, after which time he took a leave of absence. (Tr. 376). But, despite this reported outburst, along with another incident in which he yelled at his bosses and was written up, his leave of absence was voluntary, and he reported that he was never fired or laid off from a job because of problems getting along with other people. (Tr. 301).

With respect to his mental impairments, the clinical record for the pertinent period revealed that Burd was being treated by VA Medical Services, receiving psychiatric medication management and attending supportive therapy with a social worker every three weeks between November 2021 and October 2022. (Tr. 347-573). In his therapy sessions, Burd consistently reported stable mood, with occasional irritability, anxiety, and sleep difficulties, and his mental status examinations were always unremarkable, including good attitude, calm affect, stable mood, intact thought process/content, fully oriented average insight/judgment, intellectual/cognitive functioning within normal limits. (Id.)

At his initial evaluation for supportive therapy with social worker Luther Brice at VA Medical Services, Burd reported that he was seeking treatment for help dealing with bipolar disorder and would like to feel happier and less stressed. (Tr. 384-85). He reported one psychiatric hospitalization, though no details are provided,

and indicated he used medical marijuana but reported completely independent activities of daily living, including the ability to maintain a residence and do household chores. (Tr. 386). His mental status examination revealed intact concentration and memory functioning, full orientation, appropriate interpersonal behavior, no signs of impulsivity, grooming and hygiene within normal limits, average insight, and fair judgment. (Tr. 386). Around the time of his alleged onset of disability, November 9, 2021, Burd reported feeling down as a result of having his car repossessed, difficulty paying his bills, and having to file for disability because of trouble keeping a job. (Tr. 383). He took a leave of absence of work on November 12, 2021. (Tr. 376).

Burd saw psychiatrist Dr. Laurie Kile on December 9, 2021, to complete his disability paperwork. He reported two outbursts in the workplace in two months, first in September 2021, when he yelled at his bosses due to being accused of telling another person to wear a mask and again in November 2021 in the parking lot of his workplace after his car was repossessed. (Tr. 376). He was written up after the first incident and took a leave of absence before being written up for the second incident. (Id.) Burd stated that he is unable to tolerate other people well, has trouble with authority and time management, is distractible and easily annoyed. (Id.) He stated that, since returning to the workplace after an extended time with Covid remote

6

work, he had not been doing well with coworkers. Despite Dr. Kile noting no complaints about the actual help work desk he was doing, she noted that his significant temper issues may require him to work alone in order to produce his best work. (Id.) Nonetheless, Dr. Kile noted that his prognosis was favorable, that he had a stable mood and fairly good sleep, and intact cognition and memory, and Burd and Dr. Kile agreed that this was a temporary decline in his ability to work. (Id.)

Throughout early 2022, Burd continued with supportive therapy every three weeks and medication management. He reported stress, sleep issues, anxiety, and unstable mood at times due to his bipolar but mental status examinations continued to be stable and unremarkable. (Tr. 367-70, 428-62). He denied recent verbal altercations and did not report any interpersonal conflicts. (Id.) In May 2022 he reported low mood and sadness and difficulties with low motivation but denied difficulties with irritability or anger outbursts and reported sleeping well. (Tr. 449). By June 2022 he was again reporting difficulty with sleep but also noted averaging seven hours of sleep per night. (Tr. 556-57). It was recommended he increase his physical activity and change his sleep routine. (Id.) In June 2022 he reported taking his medications regularly and stable mood and denied any recent panic attacks. (Tr. 551-52). In July 2022 he continued to report low mood and occasional frustration but also reported going camping, doing yard work, and considering going back to

work at a low stress job. (Tr. 541-45). In September 2022, Burd reported to his case manager that things were going well, and he and his wife were busy remodeling their home. (Tr. 529). Throughout late 2022 he continued to exhibit symptoms of low energy and amotivation, which he stated could be attributed to his use of medical marijuana, (Tr. 495), periods of anxiety and depression, and stress due to life circumstances, but no significant worsening in mood or thought processes. (Tr. 494-537).

Burd's self-reported activities of daily living also indicated that he had some capacity for performing simple tasks. According to Burd, despite his mental impairments he reported taking care of animals, preparing his own meals, mowing, cleaning the house, vacuuming, laundry, and shopping in stores. (Tr. 297-98). He reported gaming and playing with animals as hobbies, and stated he could follow written directions fine, although he did report needing spoken directions repeated, having trouble concentrating, and not get along well with authority figures. (Tr. 301). He reported not liking changes in routine and not handling stress well but stated that he had never been fired or laid off from a job because of problems getting along with other people. (Tr. 301-02).

Burd's wife, Lauren Burd, also completed a third-party function report on January 18, 2022. Ms. Burd reported that his mood fluctuates daily between mania

and depression, some days being ready to "do anything" and other days withdrawing from all activities and sleeping. (Tr. 247-49). Ms. Burd reported that he does not handle stress or changes in routine well and has angry verbal outbursts followed by regret and suicidal ideation, but that he does not have any problems getting along with family, friends, neighbors, or others. (251-52). She also stated that he has a small group of friends, and they have video game parties and go camping about once a month and that in the summer he will camp three to five times. (Tr. 249). She reported that he has memory issues caused by his mental illness and medications, often does not finish what he starts, and does not follow written or spoken instructions well, but that he can cook simple meals, sweep, cut the grass, and shovel snow. (Tr. 252-54).

## B. **The Medical Opinion Evidence**

Four medical experts have opined regarding the extent and severity of Burd's emotional impairments. These opinions were provided by two state agency experts and two treating physicians, who completed a single joint report. The opinions were starkly different in their view of the limiting effects of Burd's mental impairments, with the non-treating state agency consultants finding he had only mild to moderate limitations in all areas of functioning and the treating physicians concluding he suffered from marked limitations.

9

With respect to the non-treating opinions, on February 3rd, 2022, state agency psychological consultant Karen Louise Plowman opined that Burd had mild limitations in his ability to understand, remember, or apply information and concentrate, persist, or maintain pace, and moderate limitations in his ability to interact with others and adapt or manage himself. (Tr. 58). Based upon her review of Burd's clinical record, Dr. Plowman opined that Burd had no understanding and memory limitations, no sustained concentration and persistence limitations, but was moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers without distracting them or exhibiting behavioral extremes. (Tr. 60). As to Burd's adaptation limitations, she opined that he was moderately limited in his ability to respond appropriately to changes in the work setting, but not significantly limited in any other arena, noting that he was able to adapt to simple changes in the workplace. (Id.) Dr. Plowman further elaborated that Burd was able to meet the mental demands for simple, one to two step tasks on a sustained basis despite the limitations associated with his impairments and that he would be limited to unskilled work. (Tr. 60-61).

On reconsideration, state agency psychological consultant Peter Garito, Ph.D., also completed a mental RFC assessment on May 27, 2022. Dr. Garito also found Burd had only mild to moderate limitations in the "paragraph B" criteria, but unlike Dr. Plowman, he opined that Burd was only mildly limited in his ability to adapt or manage himself, but was moderately limited in his ability to concentrate, persist, or maintain pace. (Tr. 76). Like Dr. Plowman, he also opined that Burd had a moderate limitation in interacting with others but only a mild limitation in understanding, remembering, or applying information. (Id.) As to his opinion regarding Burd's ability to concentrate, persist, or maintain pace, unlike Dr. Plowman, he opined that Burd would be moderately limited in his ability to maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 77). However, significantly, with regard to Burd's social interaction limitations, Dr. Garito found he was not significantly limited in his ability to interact appropriately with the general public or maintain socially appropriate behavior, though he agreed with Dr. Plowman that he had moderate limitations in accepting instructions and responding appropriately to criticism from supervisors and getting

11

along with coworkers or peers without distracting them or exhibiting behavior extremes. (Tr. 78). Dr. Garito also explained that Burd "can do one and two step tasks," makes decisions, has adequate memory, can attend regularly and would not need special supervision, understands and follows directions, and gets along with others and can behave appropriately in social situations. (Id.) He opined that Burd would be limited to unskilled work. (Tr. 79).

On July 20, 2022, Burd's treating physicians Dr. Alyssa Kunkel and Dr. Carmen Faneytt completed a mental impairment questionnaire. Their opinions differed significantly from those of the state agency consultants, noting marked limitations in each of the four "paragraph B" criteria, including understanding, remembering, and applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. (Tr. 479). They opined that Burd would have marked limitations in his ability to maintain attention for two hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with coworkers

or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, and deal with normal work stress. (Tr. 479). Drs. Kunkel and Faneytt also opined that Burd would be moderately limited in his ability to remember work-like procedures, understand, remember, and carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, and accept instructions and respond appropriately to supervisors. (Id.) Burd's treating physicians also opined that he could be expected to perform less than 80% as efficiently compared to an average worker, would likely be unable to complete an eight-hour workday four or more days per month, and would be absent from work four or more days per month due to his impairments. (Tr. 480). These treating sources did not otherwise reconcile their extreme opinions with the relatively unremarkable treatment record which they had documented.

It was against this medical backdrop that Burd's case came to be heard by the ALJ.

## C. **The ALJ Hearing and Decision**

On January 12, 2023, the ALJ conducted a hearing in Burd's case. (Tr. 34-55). During this hearing Burd and a Vocational Expert testified. (Id.) Burd testified

13

that he could dress, shower,[2] cook, shop, wash dishes, do laundry, vacuum, sweep, take out the trash, and maintain the yard, but that he sometimes had trouble remembering to do the chores or would get distracted and leave them half done. (Tr. 40, 44). While he testified to having hobbies such as computer gaming, camping, watching movies and shows, and playing with his array of pets, including cats, a dog, and a tortoise, he noted that he tries to avoid people and has anxiety getting ready to leave the house. (Tr. 44, 47). Nonetheless he stated that he has friends come over to watch movies, sees his mother and in-laws, drives, and goes camping, and stated that his medications were helping, and he was slowly getting to where he needed to be with his medications. (Tr. 42-43, 48-49).

Following the hearing, on January 23, 2023, the ALJ issued an unfavorable decision concluding Burd was not disabled under the Social Security Act. (Tr. 11-33). In that decision, the ALJ first concluded that Burd met the insured status requirements of the Social Security Act through December 31, 2026, and had not engaged in substantial gainful activity since November 4, 2021, the alleged onset date. (Tr. 16). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Burd had the following severe impairments: bipolar disorder,

---

[2] Although Burd did note at the hearing he had not showered in two weeks and changed his clothes only weekly.

intermittent explosive disorder, and posttraumatic stress disorder. (Tr. 17). The ALJ also considered Burd's obesity, obstructive sleep apnea, elevated blood pressure levels, vitamin D deficiency, and hand tremors, but determined these physical conditions posed no more than a minimal limitation upon his ability to perform basic work-related activities and were, therefore, nonsevere. (Tr. 17-18). At Step 3, the ALJ determined that none of Burd's conditions met any of the Commissioner's listing criteria. (Tr. 18-20).

On this score, the ALJ's decision found that Burd experienced no more than a moderate level of impairment, stating that:

> In understanding, remembering or applying information, the claimant has mild limitation. The claimant's wife indicates that the claimant requires reminders to attend to his personal care needs, to take medication and to go places (Exhibit 10E). In an earlier function report, the claimant indicated that while he requires reminders to take medication and to go places, he does not require reminders to attend to his personal care needs (Exhibit 5E). In a later function report, the claimant indicates that although he requires reminders to attend to his personal care needs, he does not require reminders to take medication or to go places (Exhibit 11E). The claimant's wife indicates that the claimant does not do well with following instructions (Exhibit 6E). The claimant indicated in an earlier function report that while it is hard for him to understand written instructions, he mostly does well with following spoken instructions (Exhibit 5E). The claimant indicated in a later function report that although he requires repetition of spoken instructions, he reads written instructions fine (Exhibit 11E). The claimant plays computer and video games with friends (Testimony, 10E, 11E). At an evaluation for therapy on November 1, 2021, the claimant's memory appeared intact and his intellectual functioning

appeared future focused (Exhibit 2F). When the claimant spoke with a case management provider on November 9, 2021, his cognitive functioning appeared within normal limits (Exhibit 2F). On December 9, 2021, the claimant's psychiatric provider indicated that the claimant's cognition and memory appeared intact (Exhibit 2F). At that time, the claimant did not report receiving any complaints about his actual performance of computer help desk work while he had been working (Exhibit 2F). The claimant's fund of knowledge appeared good at appointments with his psychiatric providers on April 28, 2022 and June 17, 2022 (Exhibit 4F, 6F). On July 20, 2022, the claimant's psychiatric providers noted that the claimant's cognition is intact without impairment (Exhibit 5F). On August 11, 2022 and October 26, 2022, the claimant's intellectual functioning appeared within normal limits at appointments with his psychiatric provider (Exhibit 6F). The claimant followed commands at an appointment with a provider on October 12, 2022 (Exhibit 6F). For these reasons, the record indicates that the claimant has no greater than mild limitation in understanding, remembering or applying information.

In interacting with others, the claimant has moderate limitation. The claimant has his driver's license, and he leaves the home to shop (Testimony, Exhibit 11E). The claimant has a friend who comes over or who he visits. The claimant sees his mother and his wife's parents (Testimony). The claimant testified that he camps and walks around the neighborhood (Testimony). On September 26, 2022, the claimant reported having gone camping with a friend (Exhibit 6F). The claimant's wife indicates that the claimant camps three (3) to five (5) times during the summer, attends videogame parties and goes camping with small groups of friends (Exhibit 6E). The claimant's hygiene and social and interpersonal behavior at appointments with providers has appeared within normal limits and appropriate (Exhibit 2F, 4F, 6F). The claimant on December 9, 2021 reported experiencing outbursts at work at the end of September of 2021 when he yelled at his bosses regarding telling someone to wear a mask and at the beginning of November of 2021 when he was yelling in the parking lot at work while he was trying to locate his vehicle that had been repossessed, after which he

16

voluntarily took a leave of absence from his job (Exhibit 2F). The claimant reported experiencing difficulty working with coworkers after returning to the office following extended period of remote work during the COVID-19 pandemic (Exhibit 2F). On September 26, 2022, the claimant explained that he never has been a person who has gotten out of the house much. The claimant reported at that time that he has been angry and rude most of his life while understanding that he can be very direct in the way in which he speaks with others (Exhibit 6F). The record does not document that the claimant incurred any legal charges relating to dysfunctional behavior toward others or completely is unable to leave the home. Accordingly, the record establishes that the claimant has moderate limitation in interacting with others.

With regard to concentrating, persisting or maintaining pace, the claimant has moderate limitation. As indicated above, the claimant's wife indicates that the claimant requires reminders to attend to his personal care needs, to take medication and to go places (Exhibit 10E). In an earlier function report, the claimant indicated that while he requires reminders to take medication and to go places, he does not require reminders to attend to his personal care needs (Exhibit 5E). In a later function report, the claimant indicates that although he requires reminders to attend to his personal care needs, he does not require reminders to take medication or to go places (Exhibit 11E). The claimant's wife indicates that the claimant does not do well with following instructions (Exhibit 6E). The claimant indicated in an earlier function report that while it is hard for him to understand written instructions, he mostly does well with following spoken instructions (Exhibit 5E). The claimant indicated in a later function report that although he needs repetition of spoken instructions, he reads written instructions fine (Exhibit 11E). The claimant plays computer and video games with friends (Testimony, 10E, 11E). At an evaluation for therapy on November 1, 2021, the claimant's concentration appeared intact and his intellectual functioning appeared future focused (Exhibit 2F). When the claimant spoke with a case management provider on November 9, 2021, his cognitive functioning appeared within normal limits (Exhibit 2F). On December 9, 2021, the claimant's psychiatric provider indicated that the claimant's cognition appeared intact (Exhibit 2F). At

17

that time, the claimant did not report receiving any complaints about his actual performance of computer help desk work while working (Exhibit 2F). The claimant maintained a stable level of attention throughout the interview on that date (Exhibit 2F). The claimant's fund of knowledge appeared good at appointments with his psychiatric providers on April 28, 2022 and June 17, 2022 (Exhibit 4F, 6F). On July 20, 2022, the claimant's psychiatric providers noted that the claimant's cognition is intact without impairment (Exhibit 5F). On August 11, 2022 and October 26, 2022, the claimant's intellectual functioning appeared within normal limits at appointments with his psychiatric provider (Exhibit 6F). The claimant followed commands at an appointment with a provider on October 12, 2022 (Exhibit 6F). Therefore, the record indicates that the claimant has no greater than moderate limitation in concentrating, persisting or maintaining pace.

As for adapting or managing oneself, the claimant has experienced mild limitation. The claimant lives with his wife, who works (Testimony, Exhibit 10E). The claimant performs household chores including preparing meals, cleaning, vacuuming, sweeping, vacuuming, taking out the trash and caring for household pets (Testimony, Exhibit 11E). The claimant mows the yard and shovels snow (Exhibit 10E, 11E, Testimony). On September 23, 2022, the claimant reported that he and his wife have been busy with remodeling their home (Exhibit 6F). The claimant plays videogames (Exhibit 10E, 11E). The claimant has his driver's license, and he leaves the home to shop (Testimony, Exhibit 11E). The claimant has a friend who comes over or who he visits. The claimant also sees his mother and his wife's parents (Testimony). The claimant testified that he camps and walks around the neighborhood (Testimony). On September 26, 2022, the claimant reported having gone camping with a friend (Exhibit 6F). The claimant's wife indicates that the claimant camps three (3) to five (5) times in the summer, attends videogame parties and goes camping with small groups of friends (Exhibit 6E). This record indicates that the claimant has no greater than mild limitation in adapting or managing himself.

(Id.)

Between Steps 3 and 4, ALJ then fashioned the following residual functional capacity assessment for Burd:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant retains the mental capacity to understand and remember simple, routine, repetitive tasks, to sustain attention for extended periods of two (2) hour segments while maintaining regular attendance and being punctual within customary limits and to tolerate occasional interaction with coworkers and supervisors.

(Tr. 20-21).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, the various medical opinions, and Burd's statements regarding his impairments. The ALJ first engaged in a two-step process to evaluate these alleged symptoms, finding that, although the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. On this score, after summarizing the longitudinal medical record of Burd's counseling and medication management, the ALJ concluded that:

> There is no documentation of inpatient psychiatric hospitalization, participation in a partial hospitalization or intensive outpatient program or emergency treatment for uncontrolled mental health symptoms.

Rather, the record reflects that the claimant's mental health symptoms realized improvement with medications prescribed by psychiatric providers and therapy approximately every three (3) weeks without the need for more intensive interventions. In fact, the claimant's psychiatric provider began to taper the claimant's medications that he indicated he had been taking for a long time at the claimant's request, which may have resulted in some increased symptoms that improved with further medication adjustment. While the claimant reported experiencing problems with outbursts at work after returning to an in office setting after extended remote work following the COVID-19 pandemic, it is not clear that the claimant incurred any disciplinary measures at work relating to difficulties interacting with others or outbursts. In fact, the claimant reported voluntarily taking a leave of absence after an episode in November of 2021 where he yelled in a parking garage after discovering that his vehicle had been repossessed. On that occasion, it appears that the behavior reported was prompted by the shock of discovering that his vehicle had been repossessed as opposed to an unprompted incident. There is no documentation indicating that the claimant has incurred criminal or other legal charges relating to dysfunctional behavior directed toward others. While the claimant reported to providers not liking to get out of the house or talking too much, the claimant is able to leave the home to go shopping, camping and to spend time playing videogames with friends. It appears that the desire to stay home and not to interact much with others is preferred conduct as opposed to conduct dictated by mental health symptoms. The claimant's hygiene, grooming and behavioral interactions have appeared within normal limits and appropriate at appointments with providers. Moreover, notes of treatment have not reflected deficits in the claimant's concentration, memory or cognitive functioning, which have appeared within normal limits, intact and/or good. Additionally, the claimant's election not to use a CPAP machine as prescribed and to watch television and to use the computer while trying to fall asleep may play an aggravating role with regard to the claimant's sleep related difficulties, and the claimant voiced that use of medical marijuana may be contributing to feelings of low energy and motivation, as may be the claimant's election to lie around during the days and to spend time primarily during the days and afternoons watching television and

playing computer games. These considerations establish that the allegations are not entirely consistent with the record as whole, which supports the claimant's ability to perform work activities within the residual functional capacity assigned.

(Tr. 24-25).

The ALJ also concluded that Burd's activities of daily living supported the

RFC, stating:

> The claimant's activities of daily living similarly support the claimant's ability to perform work activities within the residual functional capacity assigned. As indicated above, the claimant lives with his wife, who works (Testimony, Exhibit 10E). The claimant performs household chores including preparing meals, cleaning, vacuuming, sweeping, vacuuming, taking out the trash and caring for household pets (Testimony, Exhibit 11E). The claimant mows the yard and shovels snow (Exhibit 10E, 11E, Testimony). On September 23, 2022, the claimant reported that he and his wife have been busy with remodeling their home (Exhibit 6F). The claimant plays videogames (Exhibit 10E, 11E). The claimant has his driver's license, and he leaves the home to shop (Testimony, Exhibit 11E). The claimant has a friend who comes over or who he visits. The claimant sees his mother and his wife's parents (Testimony). The claimant testified that he camps and walks around the neighborhood (Testimony). On September 26, 2022, the claimant reported having gone camping with a friend (Exhibit 6F). The claimant's wife indicates that the claimant camps three (3) to five (5) times in the summer, attends videogame parties and goes camping with small groups of friends (Exhibit 6E). These activities of daily living are not consistent with a disabling level of impairment.

(Tr. 25).

The ALJ also found each of the medical opinions, including those of state

agency medical consultants Drs. Plowman and Garito and the joint opinion of

treating psychiatric providers Drs. Kunkel and Faneytt, persuasive to the extent that they suggested moderate or lesser limitations posed by mental health symptoms. (Tr. 25-27). Specifically, the ALJ concluded that the opinions of the state agency experts that Burd's mental impairments posed no more than moderate functional limitations upon the claimant were supported by the absence of documentation of inpatient or outpatient psychiatric hospitalization or emergency treatment for uncontrolled mental health symptoms,[3] the record indicating that Burd's mental health symptoms were improved with medications and therapy every three weeks, the lack of clarity in the record regarding whether Burd ever incurred any disciplinary measures at work relating to difficulties interacting with others, and the absence of documentation indicating he had ever incurred criminal or other legal charges relating to dysfunctional behavior directed towards others. (Tr. 26). The ALJ also found these opinions were supported by treatment notes reflecting normal hygiene, grooming, and behavioral interactions, no deficits in his concentration, memory, or

---

[3] It is worth noting that, although there is no documentation of inpatient or outpatient psychiatric hospitalization during the relevant period, Burd did report one psychiatric hospitalization to his therapist at his intake appointment in November 2021, (Tr. 385), and his treating psychiatrists also referenced a psychiatric hospitalization in their medical source opinion. (Tr. 476). However, there is no additional information about when this hospitalization occurred or the circumstances surrounding it.

cognitive functioning, and the aggravating role that noncompliance with CPAP usage, sleep hygiene, and the use of medical marijuana played in some of his reported symptoms. (Id.) The ALJ rejected the opinion of Burd's treating providers' that Burd had marked limitations in multiple areas of functioning and was unable to perform work at a competitive level for the same reasons. But, to the extent that the opinion of Burd's treating physicians, Drs. Kunkel and Faneytt, reflected no more than moderate limitations in his ability to perform work-related activities, the ALJ found this opinion to be partially persuasive. The ALJ credited this opinion to the extent that it was issued by his treating providers but noted that Dr. Faneytt appeared to have only met with Burd twice before the opinion was rendered. (Tr. 28).

Having fashioned this RFC for Burd, the ALJ then determined that there were jobs that existed in significant numbers in the national economy that he could perform. (Tr. 28-29). Based upon these determinations, the ALJ found that Burd had not been under a disability from the alleged onset date through the date of his decision and denied his application for benefits. (Tr. 29)

This appeal followed. (Doc. 1). On appeal, Burd argues that the residual functional capacity assessment lacked evidentiary support, that the ALJ failed to properly evaluate the opinions of Drs. Kunkel and Faneytt, and that the ALJ erred in the symptom evaluation in this case. This appeal is fully briefed and is, therefore,

ripe for resolution. Mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we recommend that the Court affirm the decision of the Commissioner.

## III.  **Discussion**

### A.    **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ.**

To receive benefits under the Social Security Act as an adult by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became

24

disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at

27

*5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar</u>

<u>v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun</u>

<u>v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12,

2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366

(M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating

the existence of a medically determinable impairment that prevents him or her in

engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this

burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show

that jobs exist in significant number in the national economy that the claimant could

perform that are consistent with the claimant's age, education, work experience and

RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive

requisites. Most significant among these legal benchmarks is a requirement that the

ALJ adequately explain the legal and factual basis for this disability determination.

Thus, in order to facilitate review of the decision under the substantial evidence

standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d

Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate

which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

### B.    Substantial Evidence Review – the Role of this Court

Once the ALJ has rendered a decision, it is our duty to evaluate this ruling judging the ALJ's analysis against familiar and deferential standards of review. When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.  Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an

29

adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the

burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## C.   Simple Tasks RFC Analysis

In this case, after reviewing the clinical and opinion evidence, along with Burd's activities of daily living, the ALJ concluded that he had the mental and emotional capacity to perform simple, routine, repetitive tasks despite his moderate impairments. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

United States Court of Appeals addressed the question of whether an RFC which

limited a claimant to simple tasks adequately addressed moderate limitations on

concentration, persistence, and pace. In terms that are equally applicable here, the

Court noted that "[t]he relationship between 'simple tasks' limitations and

'concentration, persistence, or pace' is a close one." Id. Given how closely related

these two concepts are, the appellate court rejected the notion advanced by the

plaintiff that an RFC which limited a claimant to simple tasks failed as a matter of

law to address moderate limitations on concentration, persistence, and pace. Instead,

the Court concluded that:

> A limitation to "simple tasks" is fundamentally the same as one "to jobs
> requiring understanding, remembering, and carrying out only simple
> instructions and making only simple work-related decisions[.]" (App.
> at 33-34;) see Davis v. Berryhill, 743 F. App'x 846, 850 (9th Cir. 2018)
> (treating "understanding, remembering, and carrying out only simple
> instructions" as equivalent to "simple tasks"); Richards v. Colvin, 640
> F. App'x 786, 790 (10th Cir. 2016) (referring to a limitation "to
> understanding, remembering, and carrying out only simple instructions
> and making only simple work-related decisions" as a "simple-work
> limitation[ ]"). Indeed, both formulations — the ALJ's and the more
> concise phrase "simple tasks" — relate to mental abilities necessary to
> perform "unskilled work." See 20 C.F.R. §§ 404.1568(a), 416.968(a)
> ("Unskilled work is work which needs little or no judgment to do
> simple duties that can be learned on the job in a short period of time.");
> SSR 96-9P, 1996 WL 374185, at *9 (July 2, 1996) (concluding that
> "unskilled work" requires "[u]nderstanding, remembering, and
> carrying out simple instructions" and "[m]aking ... simple work-related
> decisions"); cf. Richards, 640 F. App'x at 790 (treating "simple-work

33

limitations" as similar to "unskilled work" limitations). So the parties'
reliance on case law related to "simple tasks" is appropriate and helpful.

Hess, 931 F.3d at 210–11.

Having rejected a *per se* rule finding that simple task RFCs are legally
inadequate to address moderate limitations in concentration, persistence, and pace,
the Court of Appeals found that, in this setting, the issue was one of adequate
articulation of the ALJ's rationale, holding that "as long as the ALJ offers a 'valid
explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant
has 'moderate' difficulties in 'concentration, persistence, or pace.' " Id. at 211. On
this score, the appellate court indicated that an ALJ offers a valid explanation for a
simple task RFC when the ALJ highlights factors such as "mental status
examinations and reports that revealed that [the claimant] could function effectively;
opinion evidence showing that [the claimant] could do simple work; and [the
claimant]'s activities of daily living, which demonstrated that [s]he is capable of
engaging in a diverse array of 'simple tasks[.]'" Id. at 214.

###   D.    Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence

The plaintiff filed this disability application in November of 2021 after a
paradigm shift in the manner in which medical opinions were evaluated when
assessing Social Security claims. Prior to March 2017, ALJs were required to follow

regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the

foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. <u>Id</u>. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). <u>Id</u>. at §§ 404.1520c(b)(3), 416.920c(b)(3).

<u>Andrew G. v. Comm'r of Soc. Sec.</u>, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, an ALJ must evaluate various medical opinions. Judicial review

of this aspect of ALJ decision-making is still guided by several settled legal tenets.

First, when presented with a disputed factual record, it is well-established that "[t]he

ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, and importantly in this case, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base

his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129

F.Supp.3d at 214–15.

### E. <u>Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms</u>

Burd also challenges that ALJ's symptom evaluation in this case. The

interplay between the deferential substantive standard of review that governs Social

Security appeals, and the requirement that courts carefully assess whether an ALJ

has met the standards of articulation required by law, is also illustrated by those cases

which consider analysis of a claimant's reported pain. When evaluating lay

testimony regarding a claimant's reported degree of pain and disability, we are

reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. <u>See Diaz v. Comm'r</u>, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. <u>Adorno v. Shalala</u>, 40 F.3d 43, 48 (3d Cir.1994) (citing <u>Stewart v. Sec'y of Health, Education and Welfare</u>, 714 F.2d 287, 290 (3d Cir.1983)); <u>see also Stout v. Comm'r</u>, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. <u>Ray v. Astrue</u>, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

> Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015)(footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the

individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. §404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–

3p. This includes but is not limited to medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D.Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019

WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), <u>report and recommendation adopted</u> <u>sub nom.</u> <u>Koppenhaver v. Berryhill</u>, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019);<u>Martinez v. Colvin</u>, No. 3:14-CV-1090, 2015 WL 5781202, at *8– 9 (M.D. Pa. Sept. 30, 2015).

### E.     The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence," <u>Pierce</u>, 487 U.S. at 565, but rather "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Biestek</u>, 139 S. Ct. at 1154. Further when evaluating the adequacy of a decision like the ALJ's ruling in this case, which concluded that Burd could perform simple tasks despite his moderate impairments, we are reminded that that "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" <u>Hess</u>, 931 F.3d at 211. Judged against these deferential standards of review, we find that substantial evidence

supported the ALJ's decision that Burd had not satisfied the exacting criteria for disability.

### 1. The RFC Assessment

Turning first to the ALJ's residual functional capacity assessment, the plaintiff argues that the ALJ erred by not restricting Burd to one or two step tasks in the RFC that was formulated in this case. In this regard, Burd seizes upon the state agency consultants' references to one or two step tasks and contends that it was error to fail to impose such strict limitations upon Burd.

We disagree. In our view this argument fails at least two reasons.

First, the state agency consultants' own reports provided scant support for these more extreme limitations since Dr. Plowman found that Burd experienced no understanding and memory limitations or concentration and persistence limitations, and, despite noting moderate limitations in social interactions and responding appropriately to changes in the work setting, noted that he was able to interact appropriately with others across settings and adapt to simple change in the workplace. (Tr. 60). Dr. Garito similarly found that Burd had no understanding or memory limitations and was only moderately limited in maintaining attention and concentration for extended periods but not limited in carrying out even detailed instructions, sustaining an ordinary routine without special supervision, and making

simple work-related decisions. (Tr. 77). Moreover, according to Dr. Garito, Burd was able to do most tasks of daily living such as household chores, caring for pets, driving and shopping, was able to make decisions and had adequate memory, and was able to understand and follow directions. These relatively benign findings did not compel further limitations of Burd to one or two step tasks, given the ALJ's accounting for the moderate limitations opined by the state agency experts in limiting him to simple, routine, repetitive tasks. Instead, the opinions of these state agency experts, which was well supported by the clinical records, supported the conclusion that Burd could perform simple tasks in a low stress environment.

This argument also fails to fully take into account the governing legal benchmarks which provide that that an ALJ offers a valid explanation for a simple task RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, which demonstrated that [s]he is capable of engaging in a diverse array of 'simple tasks[.]'" Hess, 931 F.3d at 214. Here, the clinical, opinion and lay evidence, taken as a whole, fully supports a simple tasks RFC without any further limitations.

As to the plaintiff's argument that the ALJ failed to address why he did not limit Burd's ability to interact with the public despite finding moderate limitations in interacting with others, this argument also fails. First, the opinion evidence was equivocal as to whether Burd's moderate limitations in social interaction extended to the general public. For example, while Dr. Plowman opined that Burd had moderate limitations in his ability to interact appropriately with the general public, (Tr. 60), Dr. Garito concluded that Burd was not significantly limited in this arena, stating that he reported little social contact but no difficulty in getting along with others. (Tr. 78). The ALJ clearly adopted this viewpoint, which was fully supported by Burd's own statements and activities of daily living, in finding Dr. Garito's opinion persuasive, since the ALJ explained:

> While the claimant reported to providers not liking to get out of the house or talking too much, the claimant is able to leave the home to go shopping, camping and to spend time playing videogames with friends. It appears that the desire to stay home and not to interact much with others is preferred conduct as opposed to conduct dictated by mental health symptoms.

(Tr. 25).

Second, an independent review of the record supports the ALJ's conclusion that Burd's moderate limitations in social interaction would limit him to only occasional interaction with coworkers and supervisors but not in his interactions

45

with the public. Indeed, he reported that, although he does not get along well with authority figures, he has never been fired or laid off from a job because of problems getting along with other people. (Tr. 301). His wife stated that, although he does not handle stress or changes in routine well, he does not have any problems getting along with family, friends, neighbors, and others. (Tr. 251-52). Moreover, Burd's treating psychiatrist noted that, at the time he took a leave of absence, Burd was working at a computer help desk and she did not believe there had been complaints about the work he was doing. (Tr. 376). The medical opinion evidence also supported the ALJ's determination that Burd did not need such a limitation, since Dr. Garito concluded that Burd was not significantly limited in interacting with the general public, stating that he reported little social contact but no difficulty in getting along with others, (Tr. 78), and Burd's treating psychiatric providers did not specifically opine upon his ability to interact with the general public. Indeed, as previously explained, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." <u>Chandler</u>, 667 F.3d at 361, and "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." <u>Durden</u>,

191 F. Supp. 3d at 455. Thus, "an ALJ . . . can formulate an RFC based on different parts from the different medical opinions." Id.

Finally, despite these claims of error relating to what limitations the ALJ was obligated to impose upon the plaintiff, given the broad constellation of jobs identified by the ALJ that the plaintiff could still perform, any error would be harmless since in each instance jobs existed that the plaintiff could perform even considering these limitations.

### 2. The ALJ's Evaluation of the Medical Opinion Evidence

The plaintiff next contends that the ALJ failed to properly evaluate the opinions of treating psychiatrists Drs. Kunkel and Faneytt. However, in our view, the ALJ's decision to partially credit the opinion of Drs. Kunkel and Faneytt was adequately articulated and supported by substantial evidence. As previously noted, prior to the plaintiff's disability application in this case, the Commissioner decided to eschew this treating physician rule, which created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy, in favor of a more holistic approach which examines all medical opinions in terms of their overall consistency and supportability. Thus, our review of this case is cabined by the Social Security regulations' evolving standards regarding the evaluation of medical opinion evidence. After the paradigm shift in in the manner in which medical opinions are

evaluated when assessing Social Security claims, "[t]he two 'most important factors for determining the persuasiveness of medical opinions are consistency and supportability,' [ ] [and] [a]n ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." Andrew G. v. Comm'r of Soc. Sec. at *5 (citing 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2)). But ultimately, provided that the decision is accompanied by an adequate, articulated rationale, examining these factors, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight. Moreover, in evaluating the persuasiveness of medical opinions the ALJ may discount an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the source's medical opinion, and the doctor's actual clinical observations, justifies deeming a medical source opinion unpersuasive.  Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005).

Here, the ALJ adequately considered the supportability and consistency of the opinion of Drs. Kunkel and Faneytt and found it partially persuasive. At the outset, the ALJ properly acknowledged the treating relationship between Drs. Kunkel and Faneytt in evaluating their opinions. Further, the ALJ's consideration of the length

of treating relationship between Dr. Faneytt and the plaintiff was proper since the medical source's relationship with the claimant, including the length of the treatment relationship, while not one of the most important factors, is a factor the ALJ is to consider when evaluating the medical opinion evidence. 20 C.F.R. §§ 404.1520c(c)(3). Thus, while the plaintiff argues it was "ironic" that the ALJ noted that Dr. Faneytt had only met with Burd twice prior to rendering her opinion while crediting the non-examining source opinions, this only bolsters our view that the ALJ's evaluation of these opinions was thorough and complied with the regulations.

Moreover, in finding the opinion partially persuasive, the ALJ credited the moderate or lesser limitations opined by these experts, which he found to be supported by the clinical record and Burd's activities of daily living, but found the marked limitations and opinions to the extent that they suggested inability to perform a competitive level of work were not supported by the evidence. The ALJ cited to the treating physician's own mental status examination notes consistently showing no deficits in concentration, memory, or cognitive functioning, and normal hygiene, grooming and behavioral interactions. Indeed, while Drs. Kunkel and Faneytt noted in their July 2022 opinion that Burd would have marked limitations in every area of mental functioning, their treatment notes from around this time indicate that Burd reported overall stable moods and improvements in sleep, despite periods of low

mood, and his mental status examinations showed he was oriented, cooperative, friendly, with normal/intact memory and average/good insight/judgment. (Tr. 544-45, 551-52, 556-57). In fact, on July 25, 2022, Burd's therapist reported that Burd was contemplating going back to work but was not sure what he could do that was not going to cause a great deal of stress. (Tr. 541). Moreover, as the ALJ pointed out, Burd reported improvement in his condition with relatively conservative treatment for his mental conditions including medication management and supportive therapy every three weeks, and, although he reported two outbursts at work, he acknowledged that he had never been fired or laid off from a job because of problems getting along with people, (Tr. 301), and one treating psychiatrist noted there was no evidence of any complaints about his actual work performance at the computer help desk. (Tr. 376). Thus, with regard to the treating source opinions that Burd would be precluded by his mental impairments from working on a consistent basis, including the marked limitations in every area of mental functioning, would perform less than 80% as efficiently as the average worker, and would miss more than four days per month due to his impairments, there is simply no clinical evidence in the record to support these extreme impairments.[4] Accordingly, we find not only

---

[4] Furthermore, we note that the treating source opinion was made in a singularly unpersuasive fashion through cursory notations on a check box form. On this score,

that the ALJ's decision to only partially credit this opinion was adequately articulated, but was fully supported by the substantial evidence in the record.

### 3. *The ALJ's Evaluation of Burd's Alleged Symptoms*

Finally, the plaintiff argues that the ALJ committed multiple errors in evaluating his symptoms. Specifically, the plaintiff argues that the ALJ failed to explain how Burd's ability to engage in activities of daily living was inconsistent with his symptom allegations. At the outset, with regard to Burd's ability to engage in activities of daily living, the ALJ noted that Burd's ability to perform household chores and yard work, remodel his home, play videogames, drive, shop, visit with friends and family, and camp three to five times in the summer with small groups of friends, were not entirely consistent with a disabling level of impairment as alleged by the plaintiff. Burd acknowledges his ability to engage in the activities cited by the ALJ but argues that these activities are not analogous with the ability to work on a full-time sustained basis. However, this argument ignores the balance of the ALJ's symptom analysis which focused on the clinical treatment record showing improvement with conservative treatment and unremarkable mental status

___

it is well settled that: "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993).

examination results, and the medical opinion evidence, including the opinions of two state agency medical consultants finding Burd had only mild to moderate limitations in his ability to perform work-related activities. Thus, the ALJ's symptom evaluation rested upon three sound pillars: the medical opinion evidence, the clinical record, and Burd's activities of daily living. Each of these factors cited by the ALJ supported a determination that Burd was not entirely disabled and together they constituted substantial evidence which supported the symptom evaluation made by the ALJ in this case.

Our conclusion does not change even considering the plaintiff's argument that the ALJ erred in failing to consider his past work history. It is true that the testimony of a claimant with a long, productive work history will be given substantial credibility concerning his or her work-related limitations, assuming those limitations are also supported by competent medical evidence, however, in cases where remand has been ordered for consideration of work history, "the claimant not only had a long and productive work history, but also showed evidence of severe impairments or attempted to return to work." Corley v. Barnhart, 102 F.Appx. 752, 755 (3d Cir.2004); see e.g. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir.1979) (noting that testimony by a claimant who had 29 years of continuous work, 15 with the same employer, as to his capabilities was entitled to substantial credibility);

Witkowski v. Colvin, 999 F.Supp.2d 764, 766 (M.D. Pa. 2014) (remanding where the ALJ failed to account for a claimant's 24 years of continuous work, 15 with the same employer, when assessing his credibility). Here, the ALJ was clearly aware of the plaintiff's work history as he considered it at step four. Moreover, even if the ALJ had discussed the plaintiff's work history in his credibility assessment, it would likely not have changed the outcome of this case. The ALJ considered the record as a whole and cited ample support for his decision to partially discount the plaintiff's allegations of total disability.

Thus, at bottom, it appears that the plaintiff is requesting that this court re-weigh the medical evidence and subjective testimony. This we may not do. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of the record.") (internal citations omitted)). Rather, our task is simply to determine whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than

a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Finding that this deferential standard of review is met here, we conclude that a remand is not appropriate for the purpose of further assessing this evidence.

In sum, on its merits, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

IV.    **<u>Conclusion</u>**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: February  24, 2025

55